IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ALEXANDRA R. TRUNZO and ANTHONY HLISTA, individually, and on behalf of other similarly situated former and current homeowners in Pennsylvania, | ) ) ) ) | Civil Action No. 2:11-cv-01124 |
| | ) | Judge Mark R. Hornak |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CITI MORTGAGE, a mortgage servicer, LBPS, a mortgage servicer and PHELAN, HALLINAN, and SCHMIEG, LLP, a law firm and debt collector, | ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

## OPINION

**Mark R. Hornak, United States District Judge**

Before the Court are three Motions to Dismiss the Plaintiffs' Amended Complaint, one filed by each of the Defendants. ECF Nos. 35, 37, 39. The Court has reviewed the Amended Class Action Complaint filed by Plaintiffs Alexandra R. Trunzo and Anthony Hlista (collectively "Homeowners"), the Defendants' Motions to Dismiss, and the various briefs in support and opposition to these motions. ECF Nos. 36, 38, 40, 50-52, 56-58. The Court was also materially aided by the parties' presentations at oral argument. The matter is now ripe for disposition. As the Defendants often join in each other's points of argument, the Court addresses the three Motions to Dismiss concurrently. For the reasons that follow, Defendants' Motions to Dismiss are granted in part and denied in part.

## I. BACKGROUND

When considering a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court must accept the factual allegations in the Amended Class Action Complaint ("Amended Complaint") as true and draw all reasonable inferences in Homeowners' favor. *See Fowler v. UPMC Shadyside*, 578 F.3d 203, 211-12 (3d Cir. 2009). Therefore, for the purposes of disposition of the Defendants' various Motions to Dismiss, the essential facts are as follows.

Homeowners bring a class-action[1] suit against three defendants, who are all related to the collection of payments due under Homeowners' mortgage and associated note. These defendants are CitiMortgage ("Citi"), LBPS ("Seterus")[2], and Phelan, Hallinan, and Schmieg, LLP ("PHS").

Homeowners executed a promissory note and mortgage with their original lender, West Penn Financial ("WPF")[3] on August 31, 2007 in order to purchase a house located in Bethel Park, Pennsylvania.[4] The total principal amount due under these instruments was $69,900, payable in monthly installments of $476.85 over a thirty (30) year period and subject to an annual interest rate of 7.25%. Shortly after WPF and Homeowners completed their transaction, Homeowners received a document entitled "Notice of Assignment, Sale or Transfer of Servicing

---

[1] According to the Amended Complaint, the purported class is comprised of "all former and current homeowners who obtained financing secured by a first mortgage on property located within the Commonwealth of Pennsylvania, wherein collection demands on said mortgage loans were made by Defendant Phelan [and] includes, but is not limited to, [h]omeowners whose Note and Mortgage was serviced by Citi or [Seterus]" within the past six years. Am. Compl. ¶ 31, ECF No. 34. The propriety of class action treatment for the claims that will survive the various Motions to Dismiss is not currently before the Court.

[2] LBPS has since changed its name to "Seterus" and will be referred to as such throughout this Opinion.

[3] WPF is not a named defendant in this case.

[4] The terms of the promissory note, executed August 31st, 2007 between WPF, Anthony J. Hlista, and Alexandra R. Trunzo establishes Homeowners' duty to pay $69,900 in principal, plus interest, to the holder of the note. The mortgage, executed on the same day, between WPF, Hlista, and Trunzo, secures the Homeowners' promise to fulfill their obligations under the note in return for the conveyance of a parcel of property located at 2925 Idaho Street, Bethel Park, Pennsylvania 15102. Am. Compl. Ex. A, B, ECF Nos. 34-1, 34-2.

Case 2:11-cv-01124-MRH   Document 74   Filed 06/25/12   Page 3 of 31

Rights" ("First Servicing Notice"). Am. Compl. Ex. C, ECF No. 34-3. The First Servicing Notice informed Homeowners that, on the same day that Homeowners obtained their mortgage from WPF, WPF transferred the servicing rights under the mortgage – i.e. "the right to collect payments" – to Citi. *Id.* The notice specifically provided that this transfer "does not affect any term or condition of the mortgage instruments, other than terms directly relating to the servicing of your loan." *Id.*

Homeowners also received a document from WPF entitled "Mortgagee Letter," which announced that Citi was the "new servicer of [Homeowners'] loan" and that all future correspondence and payments should be directed to Citi. Am. Compl. Ex. F, ECF No. 34-6. Similar to the First Servicing Notice, the Mortgagee Letter stated that the transfer of the servicing rights from WPF to Citi "[did] not affect any term or condition of the mortgage instrument." *Id.* While both the First Servicing Notice and Mortgagee Letter advised that the servicing rights were transferred to Citi on August 31, 2011, Homeowners assert that the beneficial interest in their note was acquired, and is currently held, by the Federal National Mortgage Association, colloquially known as "Fannie Mae."[5] Am. Compl. ¶ 4, Ex. E., ECF Nos. 34, 34-5.

Homeowners met their payment obligations under their note until June 2010, when they ceased payment and entered into default on their mortgage. In early August 2010, Homeowners contacted Citi to negotiate an "alternate arrangement" whereby Homeowners would be able to become current on their mortgage. Am. Compl. ¶ 11, ECF No. 34. On August 13, 2010, Homeowners received a letter dated August 6, 2010 from Citi requesting certain financial information in order to evaluate whether Homeowners would be eligible for a modified repayment schedule, forbearance plan, loan modification, or other alternate method for

---

[5] Like WPF, Fannie Mae is not a named defendant in this suit.

Homeowners to return to good standing on their mortgage. Am. Compl. Ex. I, ECF No. 34-9. Homeowners were asked to respond with the requested information by August 16, 2010, which was ten (10) days from the date of the letter.

On August 16, 2010, Homeowners attempted to remit a payment to Citi, which was refused. Citi stated that it would not accept Homeowners' payment because their mortgage had, at that point, already been referred for foreclosure. Shortly thereafter, Homeowners received a letter dated August 10, 2010 from Citi's Foreclosure Department informing them that their mortgage was still in default and claiming "[a]ll reasonable efforts afforded you to cure this default have failed."[6]  Am. Compl. Ex. J, ECF No. 34-10.  The letter further provided that Homeowners should refer all future questions to the law firm handling the foreclosure proceedings, Defendant PHS.

Accordingly, Homeowners contacted PHS and inquired about avoiding foreclosure. This inquiry by Homeowners to PHS led to a litany of conflicting reinstatement figures, fees, and costs that form the primary nexus of Homeowners' Amended Complaint.  This series of contradictory communications began on August 30, 2011 when Homeowners received an initial letter from PHS that contained a total reinstatement amount of $5,204.44 needed for Homeowners to become current on their mortgage. Am. Compl. Ex. K, ECF No. 34-11.

Meanwhile, Citi assigned its servicing rights to Homeowners' mortgage to Defendant Seterus on November 1, 2010.  Homeowners were informed of this transfer via a letter entitled "Transfer of Servicing Notice" ("Second Servicing Notice").  Am. Compl. Ex. G, ECF No. 34-7. The Second Servicing Notice contains language similar to that found within the First Servicing

---

[6] Obviously, the ten (10) day "please get back to us" period set forth in Citi's August 6, 2010 letter had not run by the time Citi's second letter pulled the rug out from under any pre-foreclosure reconciliation opportunities. Given Citi's August 6, 2010 letter setting forth several possible solutions to Homeowners' default and requesting Homeowners' reply, it is difficult to fathom exactly what "reasonable efforts" had failed.

4

Notice, namely that the transfer "[did] not affect any other terms or conditions of [Homeowners']
mortgage other than the terms directly related to the servicing of [their] mortgage loan." *Id.*
Seterus promptly mailed Homeowners a letter on November 9, 2010 that detailed the total
amount of their debt with fees, $73,611.41, but Seterus did not include in this letter a loan
reinstatement amount.

The November 9th letter was followed by (1) a December 6th letter from Seterus that
included a reinstatement amount with fees, totaling $6,416.09, which was different from the
reinstatement amount of the August 30th letter from PHS, and (2) a December 7th letter from PHS
that included yet a third reinstatement amount with fees, totaling $5,362.59, which was different
from the two prior amounts present in the November 9th and December 6th letters. Am. Compl.
Ex.'s M, N, O, ECF. Nos. 34-13, 34-14, 34-15. The Court has distilled the hodgepodge of
conflicting numbers provided to Homeowners by PHS and Seterus in the less than three months
of communications between Homeowners and these two Defendants in Table 1.

**Table 1: 2010 Communication Comparisons**

| DATE OF LETTER | Aug. 30 | Nov. 9 | Dec. 6 | Dec. 7 |
|---|---|---|---|---|
| SENDER | PHS | Seterus | Seterus | PHS |
| Total Amount of Debt | ----† | $73,611.41 | ---- | ---- |
| Total Reinstatement Amount | $5,204.44 | ---- | $6,416.09 | $5,362.59 *Paid Dec. 10th* |
| Past Due Principle & Interest | $3,763.40 | | $3,814.80 | $3,814.80 |
| Interest | ---- | $2,988.38 | ---- | ---- |
| Escrow Overdraft | ---- | $1061.35 | $1,226.79 | $1226.79 |
| Late Fees | $143.04 | $0.00 | $0.00 | $96.00 |
| Property Inspections | $138.00 | $81.00 | $96.00‡ | $0.00 |
| Prothonotary Costs | $160.00 | ---- | ---- | $0.00 |
| Sheriff Costs | $75.00 | ---- | ---- | $0.00 |
| Foreclosure Costs | $225.00 | $340.00 | $340.00 | $0.00 |
| Attorneys' Fees | $700.00 | $713.50 | $713.50 | $0.00 |
| Title Services Work | ---- | $225.00 | $225.00 | $225.00 |

† Dashes indicate that the letter did not contain a particular charge as a separate line-item.

‡ This $96.00 charge was comprised of five (5) property inspections at $13.50 each that occurred once a month from May to September 2010 and one (1) property inspection at an estimated $15.00 that would occur before December 14, 2010.

While some of the apparent discrepancies between certain amounts shown in Table 1 are likely the product of accrued interest, Homeowners challenge many of the unaccountably varying fees as unauthorized by their note and/or mortgage and charged in violation of one or more state and/or federal laws. Homeowners admit that, on December 10, 2010, they remitted payment only to PHS (who allegedly collected this payment on behalf of Seterus) in the total amount indicated in the final, December 7th letter, which was $5,362.59. Homeowners did not submit a payment to Citi.[7]  Am. Compl. ¶¶ 20, 22, 57, ECF No. 34. Of the amount paid in accordance with the December 7th letter, Homeowners specifically claim that the $96.00 in "late

---

[7] Homeowners also make passing reference to a "Reinstatement Agreement," allegedly entered into on December 7, 2010. Am. Compl. ¶¶ 23, 25, ECF No. 34. However, they do not elaborate on the terms of this agreement, nor do they attach a copy of it to their Amended Complaint.

fees," were, in actuality, "fees for unreasonable serial inspections" demanded in violation of state law. *Id.* ¶ 20. In other words, Homeowners allege that the December 7th letter's "late fees" were a reconstituted and mislabeled version of the December 6th letter's "Property Inspection" charges. *Id.* Homeowners also challenge the legality of the $225.00 charge for "Title Services Work." *Id.*

After remitting payment to PHS on December 10, 2010, Homeowners assert that their mortgage was current through, but not including, January 1, 2011. They received correspondence from Seterus on December 20, 2010 that seemingly advised Homeowners that their payment was received by PHS, because Homeowners' escrow account had been credited. However, Homeowners allege that the December 20th correspondence also included an invoice for January 2011, whereby Seterus demanded an additional, unauthorized payment of $1,053.50. Am. Compl. ¶ 23, ECF No. 34.

Then, on January 4, 2011, Homeowners received a response to a "Qualified Written Request"[8] submitted to Seterus on November 17, 2010. Seterus's response showed that Homeowners were, at this time, current on their mortgage, their escrow account was not overdrawn, and that the $1,053.50 in attorney fees and mortgage costs had been waived. Despite this account statement, Homeowners claim to have again received an invoice from Seterus in February 2011 that included this same, supposedly-waived $1,053.50 charge. *Id.* ¶ 25. Homeowners also contend that Seterus levied late fees against them when they refused to pay this incorrect charge, which the servicer has repeatedly declined to waive even though, according to Homeowners, Seterus has admitted that the $1,053.50 was demanded in error.

---

[8] A "Qualified Written Request" is a formal request for information or action submitted by a borrower to a mortgage loan servicer, to which the servicer must respond within a statutorily-mandated time period. *See Jones v. ABN AMRO Mortg. Grp., Inc.*, 551 F.Supp. 2d 400, 411 (E.D. Pa. 2008) (relying upon the definition of a "Qualified Written Request" from the Real Estate Settlement Procedures Act ("RESPA")).

Homeowners filed a class-action complaint on August 3, 2011 in the Court of Common Pleas of Allegheny County. ECF No. 1-2. They bring a total of seven (7) Counts against one or multiple Defendants: five (5) of these Counts apply to Citi, five (5) apply to PHS, and all seven (7) apply to Seterus. Seterus removed Homeowners' action to this Court on September 1, 2011, based on several of Homeowners' claims that arise under federal law. ECF No. 1. Citi and PHS timely consented to the removal. ECF Nos. 3, 4. Each of the Defendants subsequently filed an initial Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), to which Homeowners responded by filing an Amended Complaint. ECF Nos. 19, 22, 24, 34. The Amended Complaint included new allegations regarding the Defendants' alleged legal statuses as servicers and/or lenders under the note and mortgage. Defendants again moved for dismissal, and the Court heard oral argument on the Motions to Dismiss the Amended Complaint on January 17, 2012. ECF Nos. 35, 37, 39. Defendants join in one another's Motions to Dismiss on various points of argument, and the Court will therefore address the merits of the Motions in the context of each individual Count of Homeowners' Amended Complaint as it applies to one or more Defendants.

## II. Legal Standard

In considering a Rule 12(b)(6) motion, federal courts require notice pleading, as opposed to a heightened standard of fact pleading. *See Phillips v. Cnty. Of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008). Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the . . . claim is and the grounds on which it rests." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 554, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)) (internal quotations omitted).

Building upon the landmark United States Supreme Court decisions of *Twombly* and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the United States Court of Appeals for the Third Circuit recently explained that a district court must take three steps to determine the sufficiency of a complaint:

> First, the Court must "take[e] note of the elements a plaintiff must plead to state a claim." Second, the Court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." Third, "whe[n] there are well-pleaded factual allegations, a Court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief." This means that our inquiry is normally broken into three parts: (1) identifying the elements of the claim, (2) reviewing the complaint to strike conclusory allegations, and then (3) looking at the well-pleaded components of the complaint and evaluating whether all of the elements identified in part one of the inquiry are sufficiently alleged.

*Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011) (quoting *Iqbal*, 556 U.S. at 1947, 1950) (internal citations omitted).

The third step of the sequential evaluation requires this Court to consider the specific nature of the claim(s) presented and to determine whether the facts pled to substantiate the claims are sufficient to show a "plausible claim for relief." *See Iqbal*, 129 S. Ct. at 1950. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. *Id.*; *see also Fowler*, 578 F.3d at 210-11.

The Court may not dismiss a complaint merely because it appears unlikely or improbable that a plaintiff can prove the alleged facts or will ultimately prevail on the merits. *Twombly*, 550 U.S. at 556. Generally speaking, a complaint that provides adequate facts to establish "how, when, and where" will survive a motion to dismiss. *Fowler*, 578 F.3d at 212; *see also Guirguis v. Movers Specialty Services, Inc.*, 346 Fed. App'x 774, 776 (3d Cir. 2009). In short, a motion to dismiss should not be granted if a party alleges facts which could, if established at trial, entitle him to relief. *Fowler*, 578 F.3d at 213.

9

## III. DISCUSSION

*COUNT I AS TO CITI AND SETERUS: BREACH OF CONTRACT UNDER PENNSYLVANIA LAW*

Homeowners contend that first Citi, then Seterus, breached their contractual obligations to Homeowners under their note and mortgage by charging or collecting: (1) attorney's fees prior to acceleration of the debt as authorized by the note, (2) attorney's fees for work never performed, (3) unreasonable attorney's fees, and (4) fees in violation the Pennsylvania Loan Interest and Protection Act, also known as "Act 6," in that the mortgage requires the lender to abide by applicable state and federal laws.

However, the provisions of their note and mortgage upon which Homeowners rely are, on their face, applicable only to "note holders" and/or "lenders." Am. Compl. Ex. A ¶ 6(E), ECF No. 34-1; Ex. B ¶ 14, ECF No. 34-2. Citi and Seterus argue that they cannot be bound by these provisions, because neither company was a party to the note or mortgage, and each company only acquired, via an assignment, the servicing rights to Homeowners' debt from WPF. In essence, Citi and Seterus assert that they never assumed the status of either a "note holder" or a "lender" under the debt instruments.

"It is basic contract law that only a party to a contract can be liable for breach of that contract." *Comcast Spectacor L.P. v. Chubb & Son, Inc.*, No. 05-1507, 2006 WL 2302686, at *19 (E.D. Pa. Aug. 8, 2006). An individual who is a party to a contract can transfer all or some of his rights and duties established by the contract to another person via an assignment. *Crawford Cent. Sch. Dist. v. Commonwealth*, 888 A.2d 616, 619 (Pa. 2005).[9] The assignee receiving the rights succeeds to no greater rights than those possessed by the assignor. *Id.* at 619-20. In other words, an assignee "stands in the shoes of the assignor" with regards to the

---

[9] The parties do not dispute that Pennsylvania law governs Homeowners' claims arising under state law, such as the breach of contract claim.

right or duty assigned. *See id.* at 620. The assignor, therefore, remains liable for a breach of any obligations arising under the contract that were not transferred to the assignee as part of the assignment. *See Am. Flint Glass Workers Union v. Anchor Resolution Corp.*, 197 F.3d 76, 81 (3d Cir. 1999).

To determine the contractual duties between the parties and any alleged breach of those duties in this case, the distinction between a "loan servicer" ("servicer") and a "lender" and/or "note holder" becomes important. The "servicing" of a mortgage, i.e. the right to collect payments from the mortgagor, exists as a separate right that can be transferred independently of other provisions in the mortgage or note. *See In re Am. Mortg. Holdings, Inc.,* 637 F.3d 246, 259-50 (3d Cir. 2011) (reiterating the Bankruptcy Court's explanation that mortgages can be sold on a "servicing retained" or a "servicing released" basis); *Paslowski v. Standard Mortg. Corp. of Ga.*, 129 F. Supp. 2d 793, 798 (W.D. Pa. 2000) (holding that the terms of the assignment did not include the servicing rights, which were retained by the seller). The original parties to the mortgage and note, the "lender" or "note holder," can, accordingly, choose to assign only this right to collection under the debt instruments. *See, e.g., Glover v. Udren*, No. 08-990, 2011 WL 1204050, at *1 (W.D. Pa. Feb. 28, 2011). The Homeowners' mortgage itself contemplates this scenario by distinguishing between a "Note purchaser's" obligations and a "Loan Servicer's" obligations. Am. Compl. Ex. B. ¶ 20, ECF No. 34-2.

Homeowners' mortgage also specifically defines a "Loan Servicer" as an entity that collects the periodic payments due under the "Note, this Security Instrument, and Applicable Law." Am. Compl. Ex. B. ¶ 20, ECF No. 34-2. This language is consistent with the definition of a "loan servicer" in the federal Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2601 (2006), *et seq.*, also referenced in Homeowners' mortgage at paragraph twenty (20),

11

which provides that an entity that receives "any scheduled periodic payments from a borrower pursuant to the terms of any loan" is a servicer. *Dahl v. Ameriquest Mortg. Co.*, 954 A.2d 588, 594-95 (Pa. Super. Ct. 2008) (citing RESPA, 12 U.S.C. § 2605(i)(2)); *See also Bridge v. Ocwen Fed. Bank, FSB,* No. 09-4220, 2012 WL 1470146, at *10, -- F.3d -- (6th Cir. 2012) (citing RESPA's section 2605(i)(3) for the definition of "loan servicing" absent such definition in the FDCPA). As a "servicer" only receives limited rights and obligations under the mortgage contract relating to servicing, it is not a party to the original debt instruments like a "lender" or "note holder," and, therefore, cannot be held liable for breaches in obligations that remain held by the "lender" or "note holder." *See Ruff v. America's Servicing Co.*, No. 07-0389, 2008 WL 1830182, at *4 (W.D. Pa. Apr. 23, 2008) (holding that a servicer was not liable for breach of contract because it was not a party to the mortgage).

Instead of pleading facts to support their conclusion that Citi and, subsequently, Seterus, succeeded to all obligations and duties under their note and mortgage, Homeowners contend that "discovery is . . . needed to determine, from a functional or activity standpoint whether Citi and/or [Seterus] is, in fact, a lender, servicer and/ or both." Am. Compl. ¶ 45, ECF No. 34. The Court does not find that Homeowners' hope that discovery would reveal that Citi and Seterus received more than the servicing rights provides enough factual support for their breach of contract claim to survive dismissal. This is especially true considering the documents[10] and factual allegations Homeowners themselves put forth, which undermine the plausibility of their conclusion that Seterus and Citi "stand in the shoes" of WPF or Fannie Mae.[11] *See Iqbal,* 129 S.

---

[10] A court may consider matters extraneous to a complaint if they are part of the public record or incorporated by reference into the complaint. *Mayer v. Belichick,* 605 F.3d 223, 230 (3d Cir. 2010); *Buck v. Hampton Twp. Sch. Dist.,* 452 F.3d 256, 260 (3d Cir. 2006).

[11] The Court also finds Homeowners' brief allegation that Citi "held itself out" as the Homeowners' lender to have minimal relevance to a pure breach of contract claim under Pennsylvania law. Such a claim requires a prima facie showing by the aggrieved party that (1) a contract existed, (2) it was breached, and (3) the Homeowners suffered

Ct. at 1950; *Crawford Cent. Sch. Dist.*, 888 A.2d at 620. For example, the First Servicing Notice

and Mortgagee Letter provide that only the servicing rights to Homeowners' note and mortgage

were transferred to Citi, and these documents specifically explain that this transfer did not affect

any other rights or duties under Homeowners' loan. The Second Servicing Notice then notified

Homeowners that Seterus assumed the servicing of their mortgage, but no other duties.[12]

Additionally, neither the mortgage nor the note requires a "servicer" to assume the same

obligations as a "lender" or "note holder," and the mortgage itself creates a distinction between a

"Note Purchaser" and "Servicer."[13]   Finally, Homeowners pled that WPF assigned the

"beneficial interests" to their note and mortgage to Fannie Mae, not Citi or Seterus. Am. Compl.

¶ 4, ECF. No. 34.

Even when the Court reads the facts alleged in the Amended Complaint and related

documents in the light most favorable to Homeowners - i.e. taking all facts Homeowners allege

as true and drawing all reasonable inferences in their favor - the Court does not find

Homeowners have sufficiently supported their legal conclusion that Citi, and then Seterus,

assumed the obligations of a "note holder" or "lender" under Homeowners' note and mortgage. [14]

---

damages as a result of the breach. *See Ferrer v. Trustees of Univ. of Pa.*, 825 A.2d 591, 610 (Pa. 2002). Homeowners advance no theory of liability based upon agency principles, where this sort of allegation would hold some import. *See, e.g., Parker v. Freilich*, 803 A.2d 738, 746 (Pa. Super. Ct. 2002) (discussing the elements of ostensible agency).

[12] Regarding Seterus, the company's status as a "loan servicer" and not a "lender" or "note holder" is underscored by paragraph sixteen (16) of Homeowners' Amended Complaint, which states that "the servicing rights on Named Homeowners' loan were transferred to Defendant [Seterus]" but is silent regarding the transfer of any additional obligations to the company.

[13] The Court is puzzled by Homeowner's use of an unexecuted, RESPA Servicing Disclosure between WPF and Homeowners to support their conclusion that WPF assigned to Citi more than the servicing rights. Am. Compl. ¶ 8 & Ex. H, ECF Nos. 34, 34-8. This document does not contain any mention of Citi and merely demonstrates that WPF did not service its own mortgages and had not done so for the past three years. *Id.*

[14] The Court also notes that, beyond the assignment issue, Homeowners do not plead enough facts to establish that they suffered any damages due to Citi's actions, as required to maintain a breach of contract claim under Pennsylvania law. *Ferrer*, 825 A.2d at 610. Homeowners allege that they only remitted payment to PHS, on behalf

Accordingly, Homeowners' breach of contract claim in Count I, relating to both Seterus and Citi is dismissed with prejudice.[15]

COUNT II AS TO CITI: UNJUST ENRICHMENT

As an alternative to their breach of contract claim, Homeowners allege that Citi was unjustly enriched when the servicer collected unauthorized fees from Homeowners and retained a percentage of these payments. To maintain a claim of unjust enrichment under Pennsylvania law, a plaintiff must allege facts that show (1) the defendant received a benefit from the plaintiff and (2) an injustice would result if the plaintiff were denied recovery of this benefit. *Meehan v. Cheltenham Twp.*, 189 A.2d 593, 595 (Pa. 1963).

Homeowners do not plead facts that support the first prong of their unjust enrichment claim against Citi. According to their Amended Complaint, Homeowners remitted a single payment to PHS, who collected this payment on behalf of Seterus, in the amount of $5,362.59 on December 10, 2010. Am. Compl. ¶¶ 20, 57, ECF. No. 34. This payment was made more than one month after Citi assigned its rights to Seterus on November 1, 2010. Therefore, under the factual allegations in Homeowners' own Amended Complaint, Citi retained no right to receive payments from Homeowners when the December 10th payment was made to PHS. Accordingly, Homeowners' unjust enrichment claim as to Citi is dismissed with prejudice.

COUNT II AS TO SETERUS: UNJUST ENRICHMENT

The Court does not reach the same conclusion regarding Homeowners' unjust enrichment claim against Seterus. Seterus held the servicing rights at the time of Homeowners' December

---

of Seterus, in the amount of $5,362.59. Citi did not collect, nor seek to collect, any portion of this contested payment.

[15] Because the Court concludes that this portion of the Amended Complaint cannot be cured by amendment, the dismissal of this Count is with prejudice. Where, on the other hand, it would appear that a pleading deficiency could plausibly be cured by amendment, a dismissal is without prejudice. *See Denton v. Hernandez*, 504 U.S. 25, 34 (1992); *Grayson v. Mayview State Hospital*, 293 F.3d 103, 108 (3d Cir. 2002).

10th payment, and Homeowners allege that (1) PHS collected this payment on Seterus's behalf, and (2) Seterus received a percentage of this payment. Am. Compl. ¶¶ 53-55, ECF No. 34. These factual assertions facially demonstrate a plausible right to relief for an unjust enrichment claim under Pennsylvania law. Seterus's Motion to Dismiss is therefore denied as to Count II of Homeowners' Amended Complaint.

*COUNT III AS TO PHS: VIOLATION OF THE FEDERAL FAIR DEBT COLLECTION PRACTICES ACT*

Homeowners claim that PHS violated the Federal Fair Debt Collection Practices Act ("the FDCPA"), 15 U.S.C. § 1692 (2006), *et seq.*, when the law firm made false representations about the "character, amount, or legal status" of Homeowners' debt and attempted to collect amounts under Homeowners' note and mortgage that were not "expressly authorized by the agreement creating the debt or permitted by law." Am. Compl. ¶¶ 60-61, ECF No. 34. Homeowners' allegations of fraudulent collection attempts stem from the August 30th and December 7th reinstatement letters they received from PHS. PHS actually collected the full amount due under the December 7th letter, $5,362.59, from Homeowners, including the disputed $321.00 in "Late Fees" and "Title Services Work" charges.

In response, PHS argues that it cannot be held liable under the FDCPA because the statute requires an attempt to collect a debt, and their letters were merely responses to Homeowners' requests for information, not "collection" or "dunning" letters. Mem. of Law in Supp. of Def. PHS's Mot. to Dis. Am. Compl. 9, ECF No. 36. PHS does not dispute that it, in general, meets the definition of a "debt collector" under the FDCPA, only that its actions toward Homeowners were not attempts at debt collection.[16]

---

[16] The FDCPA defines a "debt collector" as any person who utilizes the mail for the principle purpose of collecting a debt for "any business the principle purpose of which is the collection of any debts, or who regularly collects or attempts to collect...debts owed...[to] another." § 1692a(6).

The purpose of the FDCPA is to prevent consumers from being subjected to "abusive, deceptive, and unfair debt collection practices" by debt collectors. *See* § 1692(a), (b).   In general, the statute authorizes consumers to recover actual and statutory damages from debt collectors who engage in certain prohibited collection practices.   § 1692k.   The specific provisions of the FDCPA that Homeowners rely upon are sections 1692f(1) and 1692e(2)(A). Am. Comp. ¶¶ 60-61, ECF No. 34.  Section 1692f(1) allows a debt collector to collect only those debts that are "expressly authorized by the agreement creating the debt or permitted by law." When pursuing such authorized debts, section 1692e(2)(A) provides that the collector may not use any "false, deceptive, or misleading representations . . . in connection with the collection of any debt," nor misrepresent the "character, amount, or legal status of any debt . . . ." Accordingly, for a FDCPA claim to survive a motion to dismiss, the aggrieved party must plead that a debt collector utilized one of the aforementioned prohibited practices in an attempt to collect a debt. *See Pollice v. National Tax Funding, L.P.*, 225 F.3d 379, 400 (3d Cir. 2000).

Moreover, as a threshold matter, the FDCPA requires the existence of a communication in furtherance of the collection of a debt to trigger the statute's protections. *See* § 1692f; *Piper v. Portnoff Law Associates, Ltd.*, 396 F.3d 227, 233 (3d Cir. 2005).  Some courts draw a distinction between a communication initiated by a debt collector, and a communication sent in response to a consumer inquiry. *See, e.g., DeHart v. US Bank, N.A. ND*, 811 F. Supp. 2d 1038, 1056 (D.N.J. 2011) (acknowledging that *Gorham-DiMaggio v. Countrywide Home Loans*, No. 1:05-CV-0583, 2005 WL 2098068, at *2-3 (N.D.N.Y. August 30, 2005) stands for this proposition, but distinguishing *Gorham-Dimaggio* from the case before the court).  Though the Third Circuit has yet to speak directly on the effect of a consumer-initiated communication, the Second Circuit,

and certain district courts, hold that such communications are not actionable under the FDCPA. *See, e.g., Gorham-Dimaggio*, 2005 WL 2098068, at *2 (citing to multiple Second Circuit decisions that state that a debt collector's responses to consumer inquiries fall outside of the FDCPA's protections); *Grambart v. Global Payments Check Recovery Services*, No. 10-4399(DSD/JJK), 2011 WL 124230, at *2 (D. Minn. Jan. 14, 2011) (holding a communication initiated by the debtor was not covered by the FDCPA); *Boyd v. J.E. Robert Co.*, No. 05-CV-2455(KAM)(RER), 2010 WL 5772892, at *13 (E.D.N.Y. 2010) (stating that the debt collector must initiate the suspect communications in order for the FDCPA to apply).

In each case cited above, the court focused on whether the debt collector was "attempting to collect a debt" on the theory that a debt collector who merely provides an answer to a consumer inquiry cannot be said to be engaged in the process of debt collection. *Gorham-DiMaggio*, 2005 WL 2098068, at *2; *accord Grambart*, 2011 WL 124230, at *2; *Boyd*, 2010 WL 5772892 at *13. For example, in *Grambart*, the plaintiff requested a statement of account from the defendant debt collector, Global Check Recovery Services ("Global"). 2011 WL 124230, at *1. Global responded via two letters, both of which provided on their face that the letters' signatory, the "Recovery Coordinator," was "writing with respect to your request for a statement of your account." *Id.* The Court, focusing on the informational character of the letters, held that these responses to the plaintiff's request were not an attempt to collect a debt and, therefore, not actionable under the FDCPA. *Id.* at *2; *see also Gorham-Dimaggio*, 2005 WL 2098068, at *2. "Such communication, initiated by the debtor, is not covered by the FDCPA." 2011 WL 124230, at *2.

However, this Court does not find that the aforementioned cases stand for the proposition that any and all responses to a consumer-initiated communication automatically fall outside of

the reach of the FDCPA.  Responsive communications from debt collectors can easily be both informational and attempts to collect a debt.  Homeowners' case as pled amply illustrates this point.  According to the Amended Complaint, Homeowners were told by Citi in August 2010 that foreclosure had begun, and referred them to PHS, the law firm handling the foreclosure proceedings.  Pursuant to Citi's instructions, Homeowners then immediately contacted PHS to inquire about how to avoid foreclosure.  PHS's response letter, received by Homeowners on August 30th, was far more than informational.  Though the letter does contain the language "in accordance with your recent request . . .," it also provides the following disclaimer: "Please be advised that this firm is a debt collector attempting to collect a debt.  Any information received will be used for that purpose."   Notably, the FDCPA mandates just such a disclaimer when a debt collector is in the process of collecting a debt.  *See* § 1692e(11) (providing that a "failure to disclose in the initial written communication with the consumer . . . that the debt collector is attempting to collect a debt and that any information obtained will be used for that purpose" is a violation of § 1692e).  PHS's use of this disclosure language demonstrates that the August 30th letter was a response to a consumer inquiry as well as a collection attempt.  The former does not preclude the latter.

The Court also notes that this exchange with PHS would not have occurred but for Homeowners following Citi's instructions.  Citi expressly directed Homeowners to contact PHS when Homeowners inquired about the foreclosure notice they received from Citi.  The fact that Homeowners took the bait and reached out to PHS does not transform the purpose of Citi's and PHS's actions – the collection of a delinquent mortgage debt – into a benign exchange of helpful information.  For the foregoing reasons, the Court finds that Homeowners can challenge the legality of PHS's August 30th communication under the FDCPA.

PHS's second communication to Homeowners on the December 7th is also actionable. This letter contains the same disclosure language as the August 30th communication, demonstrating that at least one function of the December letter was to collect upon Homeowners' debt, bringing the communication within the FDCPA's purview.  In addition, the December letter is over three months removed from Homeowners' initial inquiry to PHS.  Even if the Court found that the first response letter to Homeowners' inquiry fell within the *Gorham-Dimaggio* line of reasoning, this case and the others cited by PHS do not support the law firm's proposition that the existence of a consumer-initiated request immunizes all further communications between debt collector and consumer.  The creation of such a large safe harbor for debt collectors under the FDCPA would seemingly cut against the purpose of the statute, which is to protect consumers and provide a remedy for those individuals "who have been subjected to abusive, deceptive, or unfair debt collection practices by debt collectors." § 1692(a), (b); *Pollice*, 225 F.3d at 400.[17]  Creating such broad immunization from FDCPA liability is a job for of Congress, not this Court.  Accordingly, PHS's Motion to Dismiss as to Court III of Homeowners' Amended Complaint is denied.

*COUNT III AS TO SETERUS: VIOLATION OF THE FEDERAL FAIR DEBT COLLECTION PRACTICES ACT*

Seterus argues that Homeowners cannot prevail on their FDCPA claim against it, because Homeowners rely upon violations of the Pennsylvania Loan Interest and Protection Act (also known as "Act 6") as the foundation for their FDCPA claim.  41 Pa. Cons. Stat. Ann. § 403 (West 1999), *et seq.*  Seterus asserts that since its actions in attempting to collect upon Homeowners' debt do not run afoul of Act 6, Seterus cannot be found liable for Homeowners'

---

[17] Due to its remedial nature, the Third Circuit instructs district courts to construe the FDCPA's language broadly to effect its purpose. *Dehart*, 811 F. Supp. 2d at 1054 (citing *Brown v. Card Serv. Ctr.*, 464 F.3d 450, 453 (3d Cir.2006)).

derivative FDCPA claim. However, the validity of Homeowners' Act 6 allegations, which the Court addresses next, is not the sole determining factor as to whether Homeowners' FDCPA claim survives dismissal because Homeowners do not rely only on Seterus's supposed Act 6 violations to support their FDCPA claim. To the contrary, Homeowners specifically contend that Seterus is a debt collector that made false representations regarding their debt and collected charges unauthorized by Homeowners' note and mortgage in contravention of FDCPA sections 1692e(2)(A) and 1692f(1). *See, e.g.*, Am. Compl. ¶¶ 20, 27, 60-61, ECF No. 34. These allegations stand apart from Homeowners' Act 6 assertions and provide an independent basis for Seterus's potential liability under the FDCPA. The Court therefore denies Seterus's Motion to Dismiss as to Count III of Homeowner's Amended Complaint.

*COUNTS IV AND V: CLAIMS AGAINST ALL DEFENDANTS PURSUANT TO THE PENNSYLVANIA FAIR CREDIT EXTENSION UNIFORMITY ACT AS THE STATUTE APPLIES TO DEBT COLLECTORS, CREDITORS, OR LENDERS*

Homeowners contend that Citi's, Seterus's, and PHS's debt collection efforts violated Pennsylvania's Fair Credit Extension Uniformity Act (the "FCEUA"), specifically 73 Pa. Cons. Stat. Ann. § 2270.4(a) (West 2008). Section 2270.4(a) adopts the provisions of the FDCPA by providing that "[i]t shall constitute an unfair or deceptive debt collection act or practice under this act if a debt collector violates any of the provisions of the Fair Debt Collection Practices Act." Accordingly, if a particular collection practice constitutes a violation of federal law under the FDCPA, it also amounts to a violation of Pennsylvania state law under the FCEUA.

Citi, Seterus, and PHS move to dismiss Homeowner's FCEUA claims by asserting an exception to the statute found in section 2270.3. Similar to the FDCPA, the FCEUA protections are triggered when a debt collector attempts to collect a "debt." *See* § 2270.2. However, unlike the FDCPA, the FCEUA exempts a particular type of debt instrument, the "purchase money mortgage," from its definition of "debt." "[M]oney which is owed or alleged to be owed as a

20

result of a loan secured by a <u>purchase money mortgage</u> on real estate shall not be included within the definition of debt . . . ." *Id.* (emphasis added).

Unfortunately, the FCEUA does not define the phrase "purchase money mortgage." *See generally*, § 2270.1, *et seq.* Homeowners assert that the Court should rely upon the common law definition, where a "purchase money mortgage" was defined as a mortgage extended by the seller of a property to the buyer of that same property to satisfy all or part of the purchase price for the property. *See, e.g., Appeal of Campbell*, 36 Pa. 247, 255 (1860); *Albright v. Lafayette Bldg. & Sav. Ass'n.*, 102 Pa. 411 (1883). All Defendants respond that the Court should follow the reasoning of *Glover v. Udren*, No. 08-990, 2010 WL 5829248 (W.D. Pa. Oct. 21, 2010) where this same argument was previously advanced by Homeowners' counsel and rejected by Judge Mitchell of this Court. Judge Mitchell's decision in *Glover* stemmed from an analysis of FCEUA section 2270.3 and the application of Pennsylvania's standard rules of statutory construction, codified in 1 Pa. Con. Stat. Ann. § 1921 (West 2008), *et seq.* The Court finds no cause to deviate from the sound reasoning in *Glover*.

When a statute does not define a necessary phrase, a court may look to other statutes on similar subjects to determine the phrase's meaning. *Id.* "[T]echnical" phrases are to be "construed according to such peculiar and appropriate meaning or definition," unlike phrases within the common vernacular that are ascribed their "common and approved usage." *Id.* § 1903(a). The phrase "purchase money mortgage" is a technical one, not found "within the common parlance," and so a court must determine if the Pennsylvania legislature has given the phrase a "peculiar and appropriate meaning." *Id.*; *Glover*, 2010 WL 5829248, at *6.

Indeed, as noted by the *Glover* court, the legislature has, in another statute, defined the parameters of a "purchase money mortgage." *Glover*, 2010 WL 5829248, at *6. Pennsylvania's

21

Lien Priority Law includes the common law definition of a "purchase money mortgage" and also expands the definition to encompass mortgages provided by persons other than the seller, or in other words, by a third party. 42 Pa. Con. Stat. Ann. § 8141(1)(i), (ii) (West 2007). The Lien Priority Law states that a "purchase money mortgage" is one:

> (ii) taken by a mortgagee <u>other than the seller</u> to secure the repayment of money actually advanced by such person or on behalf of the mortgagor at the time the mortgagor acquires title to the property and used by the mortgage at that time to pay all or part of the purchase price, except that a mortgage other than to the seller of the property shall not be a purchase money mortgage within the meaning of this section unless expressly stated to be so.

§ 8141(1)(ii) (emphasis added).

Homeowners' debt falls within the above definition. Their mortgage was provided by a third party, WPF, and was taken to finance their purchase of the two parcels of property in Bethel Park, Pennsylvania. The mortgage itself also declares that it is a purchase money mortgage when it is used to acquire title to a property. Am. Compl. Ex. B ¶ 26, ECF No. 34-2. Homeowners' debt is, therefore, a "purchase money mortgage" as defined under Pennsylvania law and excluded from the reach of the FCEUA. All of Homeowner's claims against Citi, Seterus, and PHS that rely upon the FCEUA are dismissed with prejudice. [18]

---

[18] The Court would reach the same result if it viewed the phrase "purchase money mortgage" as a non-technical one. Pennsylvania courts routinely rely upon current dictionary definitions of common words and phrases when engaged in the task of statutory construction. *See, e.g., Walker v. Ehlinger*, 676 A.2d 213, 215-16 (Pa. 1996) (Castille, J. dissenting) (utilizing both Black's Law and Webster's dictionaries to determine the meanings of the words "construct" and "build"); *House of Leung, Inc. v. Dept. of Health*, 38 A.3d 986, 990 (Pa. Cmwth. Ct. 2011) (using Webster's dictionary to define the phrase "separate outside entrance"); *State Farm Mut. Auto. Ins. Co. v. Cavoto*, 34 A.3d 123, 129 n.9 (Pa. Super. Ct. 2011) (citing Webster's dictionary to bolster the distinction between the terms "utilize" and "perform"). Webster's Dictionary provides that a "purchase money mortgage" is "a mortgage to secure part or all of the purchase price of the property mortgaged given by the buyer to the seller <u>or to a third person</u> furnishing a loan to the buyer." *Merriam-Webster's Third New International Dictionary Unabridged* (2002) *available at* http://www.mwu.eb.com/mwu (emphasis added). This definition is similar to the "particular meaning" ascribed to a "purchase money mortgage" by the Pennsylvania legislature in the Lien Priority Act and encompasses Homeowners' mortgage.

COUNT VI AS TO ALL DEFENDANTS: CLAIMS PURSUANT TO PENNSYLVANIA'S LOAN INTEREST AND PROTECTION ACT

Homeowners allege that Citi, Seterus, and PHS violated Pennsylvania's Loan Interest and Protection Act (also known as "Act 6"), 41 Pa. Con. Stat. Ann. § 101 (West 1999 & Supp. 2012), *et seq.* Act 6 is a "comprehensive interest and usury law with numerous functions" that offers homeowners with residential mortgages protection from "overly zealous residential mortgage lenders." *Beckett v. Laux*, 577 A.2d 1341, 1343 (Pa. Super. Ct. 1990) (internal quotations omitted). The statute defines a "residential mortgage lender" as any person who lends money...and obtains a residential mortgage to assure payment of the debt . . . ." § 101.

Homeowners rely upon multiple provisions of Act 6 in support of their contention that all three Defendants incurred liability under this statute in some manner by collecting illegal foreclosure-related attorney's fees and other foreclosure costs. These provisions include sections 404, 406, 501, and 502. Section 404 provides a residential mortgage debtor with the right to cure a mortgage default and mandates the manner in which this right to cure can be exercised. 41 Pa. Con. Stat. Ann. § 404. The language of section 404 is specific to residential mortgage debtors and therefore does not prohibit any particular conduct or place any affirmative duty on servicers or law firms.

To that end, section 404 specifically incorporates sections 403 and 406 of Act 6. However, section 403, which creates certain notice requirements for foreclosures, and section 406, which relates to the collection of attorney's fees, apply only to "residential mortgage lenders." Neither Citi nor Seterus, in their capacities as servicers of Homeowners' mortgage, fit the definition of a "residential mortgage lender" in section 101, because, as explained in the Court's analysis of Counts I and II, Homeowners' Amended Complaint does not provide a sufficient factual basis for their proposition that Citi or Seterus received, by assignment, more

rights than those relating to the servicing of Homeowner's mortgage. *See Glover*, 2010 WL 5829248, at *8 (holding loan servicer did not fall within Act 6's definition of a "residential mortgage lender). PHS, the law firm representing Citi's, then Seterus's interests, is not a "residential mortgage lender," and, in any case, Homeowners do not allege in their Amended Complaint that the law firm took on that status. Therefore, the claims under sections 404 and 406 against Citi, Seterus, and PHS are dismissed with prejudice.

The other two provisions of Act 6 upon which Homeowners rely are sections 501 and 502. These sections constitute Pennsylvania's usury law and provide a remedy to a debtor who, among other things, made interest payments to a creditor in excess of the interest rate under Pennsylvania law. §§ 501, 502; *Gilbert v. Otterson*, 550 A.2d 550, 553 (Pa. 1988). However, based on Homeowners' factual allegations, section 501 is simply inapplicable to their suit because this portion of the statute only applies to interest rates.

> When a rate of interest for loan or use of money, exceeding that provided by this act or otherwise by law shall have been reserved or contracted for, the...debtor shall not be required to pay to the creditor the excess over such maximum interest rate and it shall be lawful for such . . . debtor . . . to retain and deduct such excess from the amount of such debt . . . .

§ 501.

Homeowners do not allege that they remitted any such statutorily excessive interest payments; rather, they claim to have paid charges for "unreasonable serial inspections" and unauthorized "title services work" to PHS, who collected these payments on behalf of Seterus. Am. Compl. ¶ 20, ECF No. 34. Neither of these fees implicates in any way an interest rate in excess of the statutory maximum. Regarding the remaining Defendant Citi, Homeowners themselves allege that the company transferred its servicing right to their note and mortgage well prior to Homeowners remitting any of the contested payments. Accordingly, Homeowners'

claim under section 501 against Citi is dismissed with prejudice. This claim is dismissed without prejudice as to Seterus and PHS.[19]

Finally, section 502 provides that a person may recover treble damages against the person who received a payment of (1) excessive interest or (2) "charges prohibited or in excess of those allowed by this act or otherwise by law . . . ." § 502. By including the term "charges," section 502 on its face is more expansive than 501 and is not limited solely to the subject of interest rates. *Compare* § 501, *with* § 502. Defendants argue that section 502 is, like 404 and 406, applicable only to "residential mortgage lenders." The Court again finds the *Glover* decision instructive as Judge Mitchell resolved this very same dispute regarding section 502 in the context of a motion to dismiss.[20]

Section 502 provides that a person who has paid charges in violation of Act 6 or otherwise by law can recover against "the person who has collected such excess interest or charges." § 502 (emphasis added). As noted by the *Glover* court, the Pennsylvania legislature's use of the term "person" in section 502 as opposed to the phrase "residential mortgage lender" in sections 404 and 406 is significant. *Glover*, 2010 WL 5829248, at *7. Act 6 defines the term "person" broadly, providing that it includes, but is not limited to, "residential mortgage lenders" and encompasses individuals, corporations, business trusts, estate trusts, partnerships, and all

---

[19] PHS's and Seterus's dismissal is without prejudice because the Court finds that the contradictory communications sent by Seterus and PHS to Homeowners are at best, unclear, and at worst, a fundamentally confusing puzzle. The Court cannot exclude the reasonable possibility that the discovery process may reveal that the charges paid by Homeowners did indeed include excessive interest amounts, since what the charges actually comprise is, on this record, murky. Homeowners may renew their allegations against PHS and Seterus upon a showing of new, legally sufficient evidence.

[20] On June 21, 2012, PHS submitted a "Notice of Supplemental Authority," which provided this Court with the opinion of *Glover v. Udren Law Offices, P.C.,* No. GD-11-018015 (Pa. Ct. Comm. Pl., June 13, 2012). ECF No. 72. This opinion is not binding on the Court, as it is not a decision of the highest court of Pennsylvania, and, while Judge Wettick's opinion is both thoughtful and informative, this Court finds the reasoning of Judge Mitchell in *Glover v. Udren,* No. 08-990, 2011 WL 1204050, at *1 (W.D. Pa. Feb. 28, 2011) on this point more persuasive.

other legal entities.  § 101.  Therefore, all three Defendants fall within this definition and are subject to section 502's prohibitions.

However, for a person to be held liable under section 502 they must have collected some illegal charges.  *See* § 502 (applying only when a person "has paid" a statutorily-excessive rate of interest or charges prohibited by law).  Citi did not receive any contested payment because, as previously noted, Homeowners only allege that they remitted a payment to PHS after Citi had transferred its servicing rights to Seterus.  Homeowners' claim under Act 6 section 502 against Citi is therefore dismissed with prejudice.  As Homeowners' allege that PHS collected charges in violation of Act 6 on behalf of Seterus, these two Defendants' Motions to Dismiss as to claims arising under section 502 are denied.

COUNT VII AS TO ALL DEFENDANTS:  CLAIMS UNDER THE UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW

The Unfair Trade Practices and Consumer Protection Law ("UTPCPL") is Pennsylvania's consumer protection law.  *Bennett v. A.T. Masterpiece Homes at Broadsprings, LLC,* 40 A.3d 145, 151 (Pa. Super. Ct. 2012).  Its purpose is to prevent "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce," as defined by the act.  *Id.*; 73 Pa. Cons. Stat. Ann. § 201-3 (West 2008).   The Pennsylvania Supreme Court has stated that the UTPCPL should be liberally construed in order to effect its legislative goal of consumer protection.  *Bennett,* 40 A.3d at 151 (citing *Pennsylvania ex rel Creamer v. Monumental Properties, Inc.,* 329 A.2d 812, 814 (Pa. 1974).

Homeowners rely upon two specific definitional provisions of the UTPCPL for their claims that PHS, Citi, and Seterus engaged in "unfair or deceptive acts or practices." § 201-2(4).  The first, Section 201-2(4)(v), is inapplicable to the facts as alleged by Homeowners.  This section labels as "unfair or deceptive" the act of "[r]epresenting that goods or services have

sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation or connection that he does not have." In other words, section 201-2(4)(v) applies to cases where a defendant misrepresents the characteristics of a product, such as suits involving false advertising. *See, e.g., Haggart v. Endogastric Solutions, Inc.*, No. 10-0346, 2011 WL 466684, at *6 (W.D. Pa. Feb. 4, 2011) (noting that Pennsylvania law requires a plaintiff to allege, among other things, that the challenged advertisement is false for liability under section 201-2(4)(v) to attach); *Glover*, 2010 WL 5829248, at *9 (W.D. Pa Oct. 21, 2010) (dismissing claim against a mortgage servicer, because the servicer did not make any deceptive representations regarding the "characteristics, uses, or benefits" of a loan modification agreement); *Meyer v. Cmty. Coll. of Beaver Cnty.*, 2 A.3d 499, 549 (Pa. 2010) (noting that sections 201-2(4)(v) through (vii) relate to claims of non-conforming goods or services). Homeowners' allegations that they paid improper reinstatement fees when in default does not equate to an allegation that PHS, Citi, or Seterus misrepresented the actual characteristics or benefits of the note and mortgage themselves. *Glover*, 2010 WL 5829248, at *9. Accordingly, to the extent that Homeowners bring claims against Defendants under section 201-2(4)(v) of the UTPCPL, that claim is dismissed with prejudice.

The second UTPCPL provision upon which Homeowners rely is the "catchall provision" of section 201-2(4)(xxi). This section is expansive in that it encompasses a wide range of circumstances because a defendant need only engage in "any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding" for liability to attach. *Id.* PHS argues that a heightened level of pleading akin to an allegation of common law fraud is required to bring an action pursuant to the "catch-all" provision, and Homeowners fail to meet this heightened threshold. *See, e.g., Ross v. Foremost Ins. Co.*, 998 A.2d 648, 654 (Pa. Super.

Ct. 2010) ("In order to establish a violation of the [UTPCPL's] catchall provision, a plaintiff must prove all of the elements of common-law fraud." (internal quotations omitted)). Similarly, Citi and Seterus argue, among other things, that Homeowners do not show that they relied upon any statements from either company. Justifiable reliance on a misrepresentation is an element of common law fraud, along with scienter, intention by the defendant to induce action, and damages to the plaintiff. *Id.*

Recent developments in Pennsylvania law convince this Court that meeting a heightened "fraud pleading" standard is not required to maintain a cause of action under the "catch-all" section of the UTPCPL. In *Bennett v. A.T. Masterpiece Homes at Broadsprings, LLC*, 40 A.3d 145 (Pa. Super. Ct. 2012), the Pennsylvania Superior Court analyzed two conflicting lines of cases on this issue of the appropriate pleading standard. One line of cases relied upon the pre-1996 language of section 201-2(4)(xxi) to conclude that litigants must allege enough facts to satisfy the elevated pleading standard necessary for common law fraud. *Id.* at 152. However, the *Bennett* court noted that these cases had not considered the change to the "catch-all" provision's language in 1996, when the Pennsylvania legislature amended section 201-2(4)(xxi) to include the term "deceptive" in addition to the term "fraudulent." *Id.* In order to give effect to all words in the statute as required by the Pennsylvania rules of statutory construction, the *Bennett* court adopted the reasoning of an opposing line of cases, which held that the inclusion of the word "deceptive" in section 201-2(4)(xxi) "lessened the degree of proof" needed to maintain an action under the "catch-all" provision. *Id.* at 153-55. The Superior Court concluded its reasoning by stating "we hold deceptive conduct which creates a likelihood of confusion or misunderstanding can constitute a cognizable claim under Section 201-2(4)(xxi)." *Id.* at 154-55. Accordingly, conduct that is capable of being interpreted as "misleading" falls within the reach

of the UTPCPL. *See id.* at 156 (holding that the lower court correctly instructed the jury when it stated that "misleading conduct" was actionable under the UTPCPL's catch-all provision). Having reviewed the *Bennett* court's analysis and the cases underpinning its decision, this Court is satisfied that section 201-2(4)(xxi) does not require a litigant to plead the elements of common law fraud.

Regarding the alleged deceptive conduct here, Homeowners have asserted sufficient facts at this stage in the proceedings to show that confusion or misunderstanding could reasonably arise from PHS's, Citi's, and Seterus's actions and that Homeowners were indeed misled by those actions. Homeowners allege that Citi referred Homeowners' mortgage to foreclosure while, at the same time, the company was representing to Homeowners that there was the possibility of an alternate payment arrangement. The purpose of this arrangement was to allow Homeowners to avoid the very foreclosure proceedings Citi initiated. PHS and Seterus then sent Homeowners multiple conflicting reinstatement letters, which Homeowners allege contain misrepresentations as to the amount of their debt. Homeowners further claim that they were damaged when they remitted a payment that included intentionally mislabeled fees. These allegations allow Homeowners to maintain a cause of action against all three Defendants under the UTPCPL's "catch-all" section.

Citi and Seterus also advance another argument in support of their Motions to Dismiss regarding the UTPCPL. They claim that Homeowners lack standing to sue them under the UTPCPL, because neither Citi nor Seterus were original signatories to the note and mortgage, meaning that Homeowners cannot allege that they purchased any goods or services from either Citi or Seterus. However, the UTPCPL's reach is expansive, and, to that end, the Third Circuit in *In re Smith*, 866 F.2d 576 (3d Cir. 1989) emphasized that a district court should not limit the

UTPCPL's application to only those circumstances where the unfair or deceptive conduct induced the consumer to make the initial purchase. *Id.* at 583. Such a reading of the statute "would insulate all kinds of practices from the [UTPCPL], such as <u>debt collection</u>, which occur after entering an agreement and which were not a basis for the original agreement." *Id.* (emphasis added). Similarly, liability can be imposed upon a mortgage assignee under the UTPCPL providing the plaintiff advances specific allegations of wrongdoing against the assignee, not simply against the original lender. *See Murphy v. F.D.I.C.*, 408 Fed. App'x. 609, 611 (3d Cir. 2010) (emphasizing the UTPCPL does not impose liability on a loan assignee absent claims of an assignee's wrongdoing). Homeowners assert such allegations directly against both Citi and Seterus here. Therefore, the fact that Citi and Seterus were not parties to the original mortgage is not dispositive. For the foregoing reasons, all Defendants' Motions to Dismiss as they apply to Homeowners' claims under the UTPCPL are denied.

## *IV. CONCLUSION*

Homeowners' Amended Complaint, purportedly on behalf of a class of similarly-situated homeowners, has its genesis in a daisy-chain of facially inconsistent debt collection communications. For the reasons set forth above, the remedial reach of federal and Pennsylvania law is not as expansive as Homeowners allege, but not as cabined as Defendants suggest.

The Court dismisses with prejudice Homeowners' claims of: (1) breach of contract (Count I) against Citi and Seterus because these Defendants were not parties to Homeowners' mortgage and note nor were they assigned the duties, obligations, or responsibilities of a "lender" or "note-holder" from WPF or Fannie-Mae; (2) unjust enrichment (Count II) against Citi because the servicer did not receive the benefit of any disputed payment; (3) violations of the FCEUA against all Defendants (Counts IV and V) due to the statutory exemption regarding purchase

money mortgages; (4) violations of Act 6 sections 404 and 406 (Count VI) against all Defendants due to these sections' applicability to residential mortgage lenders only; (5) violations of Act 6 sections 501 and 502 (Count VI) against Citi because the servicer did not collect any contested payment; and (6) violations of UTPCPL section 201-2(4)(v) (Count VII) against all Defendants due to a lack of deceptive representations regarding the benefits of Homeowners' note and mortgage. Homeowners' claims against Seterus and PHS arising under Act 6 section 501 (Count VI) are dismissed without prejudice.[21] All remaining claims against the respective Defendants survive dismissal under the standards of *Iqbal* and *Twombly*.

An appropriate order will enter.


/s/ Mark R. Hornak
Mark R. Hornak
United States District Judge


Dated: June 25, 2012


cc:  All counsel of record.

---

[21] These claims may not serve as an independent basis for discovery, but Homeowners may seek leave of the Court to further amend their Complaint based upon relevant, non-conclusory, plausible, factual allegations.